IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:15-cr-00066-5 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| RICKY THOMPSON | ) | |

**MEMORANDUM OPINION**

Pending before the Court is Defendant's Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 507, "Motion"). Via the Motion, Defendant seeks a reduction of his 420-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP"), pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to his specific health profile, satisfies the requirement of "extraordinary and compelling reasons" necessary for this Court to grant "compassionate release"[1] under Section 3582(c)(1)(A)(i), and that compassionate release is otherwise appropriate in his case. The Government has filed a response in opposition (Doc. No. 509, "Response"), arguing that Defendant's Motion should be denied because consideration of the 18 U.S.C. § 3553(a) factors counsels strongly against granting compassionate release.

---

[1] Such motions are also known as ones for "compassionate release"; thus, the Court refers to both "compassionate release" and "sentence modification" throughout this opinion when referring to Defendant's requested relief. *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at n.2 (D. Utah Feb. 18, 2020) ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020).

BACKGROUND

On September 14, 2016, a Third Superseding Indictment was filed in this Court charging Defendant with four counts: conspiracy to distribute and possess with the intent to distribute 1,000 grams or more of a mixture or substance containing heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); money laundering, in violation of 18 U.S.C. § 1956(h) (Count Two); possession of a firearm in furtherance of a federal drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and conspiracy to commit witness tampering, in violation of 18 U.S.C. § 1512(k) (Count Four). (Doc. No. 178).

After a seven-day jury trial, Defendant was convicted on all four counts. (Doc. No. 373). On December 20, 2017, visiting United States District Judge Sean Cox sentenced Defendant to serve 420 months of imprisonment followed by 10 years of supervised release. (Doc. No. 453).[2] Defendant has been serving his sentence at FCI Gilmer. According to BOP, Defendant's release date is December 28, 2045. *See Federal Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed Dec. 28, 2020).

LEGAL STANDARDS FOR "COMPASSIONATE RELEASE"

Prior to 2018, only the Director of the Bureau of Prisons could move for compassionate release. The First Step Act amended 18 U.S.C. § 3582(c) to allow prisoners to move for compassionate release on their own behalf. *See* First Step Act of 2018, § 603, Pub. L. No. 115-391, 132 Stat. 5239. Now, under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act,[3] a district court *may* under certain circumstances grant a defendant's motion for

---

[2] The undersigned took no part in the trial or sentencing of Defendant and indeed was at no point assigned to Defendant's case until the instant Motion was filed.

[3] That paragraph of Section 603 provides:

(b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE

compassionate release (hereinafter, "defendant-filed motion"). *See United States v. Jones*, 980 F.3d 1098, 1106 (6th Cir. 2020) ("Congress's use of 'may' in § 3582(c)(1)(A) dictates that the compassionate release decision is discretionary, not mandatory."). In order to grant such a defendant-filed motion, however, a court must find that the so-called "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier." *See also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) (explaining that a district court may not disregard the exhaustion requirements of Section 3582(c)(1)(A)).[4]

Once it properly can act on a defendant-filed motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court next determines whether, in its discretion, to grant compassionate release to a defendant. In its recently issued opinion in *Jones*, the Sixth Circuit discussed the steps of the compassionate release analysis:

> The three-step § 3582(c)(1)(A) test is as follows. At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i).12 At step two, a court must "find[ ]" whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id*. § 3582(c)(1)(A) (emphasis added). The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. *See* U.S.S.G. § 1B1.13 (U.S. Sent'g Comm'n 2018). Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." *Dillon* [*v. United States*], 560 U.S. [817,] 827 [(2010)]. At step three,

---

RELEASE.—Section 3582 of title 18, United States Code, is amended—
    (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

[4] In this case, the Government concedes that Defendant has exhausted his administrative remedies. (Doc. No. 509 at 11 (citing Doc. No. 509-2 at 1)).

> "§ 3582(c)[ (1)(A) ] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *Id*.

*Jones*, 980 F.3d at 1108. The court then went on to resolve the following question with respect to defendant-filed motions (as opposed to compassionate-release motions filed BOP) in particular: "given the First Step Act's procedural reforms to compassionate release, is § 1B1.13 still an applicable—'that is, "relevant" or "appropriate,"' [*United States v. Ruffin*, 978 F.3d 1000, 1007–08 (6th Cir. 2020)]—policy statement for the purposes of the second § 3582(c)(1)(A) inquiry?" *Id*. The court noted that this is a question that has "sharply divided the courts," *id*. (citation omitted), as many district courts, including this Court, previously considered the Section 1B1.13 policy statements applicable when determining whether compassionate release was warranted. The court then chose a side, holding that "the passage of the First Step Act rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release." *Id*. (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020)).[5] Therefore, "[u]ntil the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *Id*.

In other words, because § 1B1.13 is inapplicable to defendant-filed motions, a district court adjudicating such a motion is not bound by anything § 1B1.13 has to say about—including any limitations or requirements § 1B1.13 would impose upon—the finding of extraordinary and compelling reasons. But this rule is not the only consequence of the Sixth Circuit's decision in

---

[5] Prior to *Jones*, this Court treated § 1B1.13 as applicable to all motions for compassionate release, whether filed by BOP or by a defendant. The Court does not necessarily perceive that such treatment resulted in a resolution of any defendant-filed motions that was any different than the result the Court would have reached by treating § 1B1.13 as inapplicable to defendant-filed motions. But the Court does note that at least the analytical framework it used prior to *Jones* was different than the analytical framework it will use in the aftermath of *Jones*.

*Jones*. Another is that the district court, in adjudicating a defendant-filed motion, may disregard the requirement of § 1B1.13(2) that the court find the defendant not pose a danger (to any other person or to the community) in order to grant compassionate release.

If, in adjudicating a defendant-filed motion, a district court determines that "extraordinary and compelling reasons" for compassionate release exist, the court then determines whether compassionate release is warranted in light of the Section 3553(a) sentencing factors. *See Jones*, 980 F.3d at 1112.[6] The sentencing factors set forth in Section 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
> i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
> ii) [in effect at the time of sentencing]
>
> (5) any pertinent policy statement—
> A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and
> B) [and in effect at the time of sentencing]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

---

[6] As suggested above, under *Jones*, the analysis of a defendant-filed motion differs from the analysis of a BOP-filed motion in that (among other ways) the latter kind of motion—to which § 1B1.13 remains applicable—requires an intermediate determination of whether the defendant-movant poses a danger to other persons or the community. *See* U.S.S.G. §1B1.13(2).

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## ANALYSIS

I. EXTRAORDINARY AND COMPELLING REASONS

In addressing the merits, the Court generally must first determine whether "extraordinary and compelling reasons" exist for Defendant's compassionate release. Defendant bears the burden to show that extraordinary and compelling reasons exist warranting his release. *United States v. Shabudin*, 445 F. Supp. 3d 212, 214 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at *3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

In the Government's response, it asserts that based on Defendant's medical records provided by BOP, Defendant "appears to suffer from severe obesity, among other ailments, to include some form of heart disease, essential hypertension and prediabetes." (Doc. No. 509 at 12). The Government concedes that based on the "net effect" of these conditions, combined with the COVID-19 pandemic, Defendant "appears to satisfy the requirement of establishing 'extraordinary and compelling reasons' within the meaning of § 3582(c)(1)(A) that entitles him to consideration of a possible reduction of his sentence." (*Id*. at 13). Based on this concession, Defendant is at least eligible for a sentence reduction pursuant to Section 3582(c)(1)(A). Thus, the Court must next determine whether compassionate release is warranted in light of the Section 3553(a) sentencing factors. *See Jones*, 980 F.3d at 1112.

II. SECTION 3553(a) FACTORS

Despite conceding that Defendant has shown extraordinary and compelling reasons exist, the Government argues that Defendant's Motion nevertheless should be denied because

consideration of the Section 3553(a) factors militate against granting compassionate release to Defendant. (Doc. No. 509 at 13-16). The Court agrees, as reflected by the below analysis of factors.[7] *See Jones*, 980 F.3d at 1112-13 (explaining that the district court must supply specific factual reasons in its consideration of the Section 3553(a) factors).

*The nature and circumstances of the offense* cut against compassionate release. Defendant's instant offense of conviction involves significantly dangerous conduct. The Sixth Circuit (on appeal) described the offense conduct as follows:

> Defendant-Appellant Ricky Thompson was a drug dealer based in Toledo, Ohio. Thompson sold cocaine, marijuana, and as the opioid crisis intensified in 2014, heroin, to both end users and smaller distributors. Thompson was known for the high volume of his drug trade; in the three years preceding Thompson's arrest in March 2016, Thompson's primary supplier, Justin Howard, routinely fronted between 600 and 1,000 grams of heroin per week to Thompson. In his own words, Thompson was "the biggest drug dealer that ever come out of Toledo." (R. 428, PID 2880.)
>
> Although many of his individual buyers lived in and around the Toledo area, Thompson also sold large quantities of heroin to two brothers, Derrick Gilligan and John Rupley, for resale in Tennessee. Rupley had first met Thompson fifteen years earlier when Rupley bought crack cocaine from Thompson in Toledo. Rupley and Thompson had a falling out in 2009, but Gilligan maintained a relationship with Thompson, working as Thompson's "assistant" in his drug-trafficking enterprise while Rupley was incarcerated. (R. 425, PID 2190.) In April 2014, Rupley was released on parole, and he and Gilligan moved to Tennessee to live with an aunt. Shortly after his release, Rupley learned that although heroin sold for $100 per gram in Toledo, he could sell it in Tennessee for two or three times that amount. Thompson found out through Gilligan that Rupley had started selling drugs, and Thompson contacted Rupley about selling his heroin. Gilligan and Rupley made their first trip to Toledo to purchase heroin from Thompson in the summer of 2014.
>
> Rupley's and Gilligan's drug operation rapidly expanded. At first, the brothers would drive from Nashville to Toledo, where Thompson would sell them 20 grams of heroin, and Rupley and Gilligan would return to Nashville. Over the next eight months, Thompson supplied Rupley and Gilligan with increasingly larger quantities of heroin—from 50 grams, to 100 grams, to 300 grams in their final

---

[7] *Jones* suggests that a district court has the discretion to assume *arguendo* that extraordinary and compelling reasons exist and then turn to the Section 3553(a) factors, inasmuch as *Jones* affirmed a district court that did exactly that. *See Jones*, 980 F.3d at 1108 ("Thus, the district judge in Jones's case permissibly assumed for the sake of argument that extraordinary and compelling circumstances existed[.]").

exchange in March 2015. Thompson also taught Rupley how to cut the heroin with dietary fiber supplements in order to dilute the heroin and maximize profits.

Because Rupley's ability to travel was restricted while he was on parole, he and Gilligan enlisted others to assist in the trips to Toledo. Justin Clements often served as the driver, and made between fifteen and twenty trips to Toledo with Gilligan to purchase heroin from Thompson. Gilligan purchased a conversion van to make the trips to Toledo more comfortable; while Clements drove, Gilligan sat in the back and played video games. Tiffany Wright often rode with Clements to Toledo, returning to Nashville via Greyhound bus with a 100-gram package of heroin. These individuals—like Rupley and Gilligan—were heroin addicts, and typically were paid for their work in heroin. The brothers also used the heroin they bought from Thompson as currency in a separate prostitution conspiracy in which Gilligan recruited vulnerable women over the internet, introduced them to heroin, and induced them to commit prostitution in exchange for heroin. The women, including Alaina Rank and Katie Dias, occasionally assisted Rupley and Gilligan in their drug-trafficking scheme by traveling to Toledo and transporting the drugs back to Nashville.

The brothers used varied methods to pay for the heroin. Initially, they paid Thompson in cash, in person. Once, in lieu of cash, the brothers paid Thompson with a truck-load of stolen televisions that Thompson wanted for a sports bar he was managing. After a highway-patrol stop en route to Toledo in November 2014 resulted in the seizure of nearly $10,000 with which Gilligan intended to buy heroin, Thompson began fronting the heroin to Rupley and Gilligan and accepted larger, less-frequent cash payments. Thompson also instructed Rupley and Gilligan to wire funds to him through Wal-Mart's money-order service, using intermediaries to both send and collect the money in order to disguise their identities.

When Rupley and Gilligan were arrested by federal authorities in March 2015, Thompson took steps to protect himself from law-enforcement scrutiny. While in pre-trial detention, Gilligan sent discovery materials to Thompson through an uncharged co-conspirator (Samantha Napier) to warn Thompson that he had been identified as their heroin supplier. Napier was later served a subpoena to testify before the grand jury. Gilligan urged Napier to ignore the subpoena, suggesting that she would receive only minor punishment if she failed to appear.

After Rupley and Gilligan were arrested, Thompson continued his drug-trafficking operations for nearly a year. The Toledo Metro Drug Task Force began surveilling Thompson in November 2015. The Task Force used confidential informants to perform controlled buys from Thompson at several different residences owned by Thompson, and conducted "almost daily" surveillance of Thompson. (R. 344-1, PID 1147–62.)

On March 2, 2016, law-enforcement authorities arrested Thompson at one of his Toledo homes. The search of his residence yielded approximately $10,000 in cash,

a large quantity of heroin, cocaine, crack cocaine, and a firearm. A search of Thompson's white Cadillac, which was registered in his girlfriend's name and parked in his neighbor's driveway, revealed bags of marijuana, heroin, six handguns, and a loaded AR-15 rifle.

*United States v. Thompson*, 758 F. App'x 398, 400–01 (6th Cir. 2018).

The Government asserts that this conduct can be characterized as both serious and extensive, and inclusive of an effort to undermine the integrity of the criminal justice system through the commission of various obstructive acts. (Doc. No. 509 at 14). The Court agrees. Defendant served as a leader in a large-scale heroin distribution network that involved several people and multiple states. Firearms, large quantities of drugs, and a significant amount of money were discovered in his home and vehicle. Based on these facts, the Court finds that the nature and circumstances of Defendant's underlying offense weigh against granting compassionate release.

*The history and characteristics of Defendant and the need to protect the public from further crimes of Defendant* cut against compassionate release.

The Government argues that this factor weighs against granting Defendant compassionate release because Defendant's "criminal history, which spans more than 20 years, garnered 14 criminal history points, placing him in the highest criminal history category." (Doc. No. 509 at 14 (citing PSR at ¶ 78)). In 1992, Defendant was convicted in Lucas County Common Pleas Court (Toledo, Ohio) of aggravated assault after he attempted to cause physical harm to another "by means of a deadly weapon." (PSR at ¶ 58). In 1994, Defendant was convicted in Toledo Municipal Court of providing false information to a police officer. (*Id*. at ¶ 62). In 1997, Defendant was convicted in Lucas County Common Pleas Court of attempted trafficking in counterfeit controlled substances. (*Id*. at ¶ 65). In 1999, Defendant was convicted in Lucas County Common Pleas Court of possession of crack cocaine. (*Id*. at ¶ 69). In 2000, Defendant was convicted in Toledo Municipal Court of drug possession. (*Id*. at ¶ 70). In 2002, Defendant was convicted in Toledo Municipal

Court of domestic violence after he choked a victim and slammed her to the ground. (*Id*. at ¶ 72). In 2004, Defendant was convicted in Lucas County Common Pleas Court of possession of crack cocaine and thereafter sentenced to four years' incarceration. (*Id*. at ¶ 73). In 2009, a little over a month after he was released from his prison, Defendant was convicted in Lucas County Common Pleas Court of possession of cocaine. (*Id*. at ¶ 75).

The Court finds that the history and characteristics of Defendant, and the need to protect the public, weigh heavily against granting compassionate release under these factual circumstances. The Court does not presume this merely because Defendant is currently incarcerated for serious offenses. The inquiry is more comprehensive than that, involving most significantly a review of Defendant's entire criminal history. As the Government notes, at sentencing Defendant fell into in the highest criminal history category. (PSR at 30). Combined with his current offense, this criminal record, which includes serious conduct and dates back to his time as a juvenile, prevents the Court from concluding that Defendant would not pose a danger to the community if released. *See United States v. Serrano*, No. CR 13-4004 RB, 2020 WL 3869475, at *2 (D.N.M. July 9, 2020) (denying motion for compassionate release where the defendant had an extensive criminal history that included violent crimes and firearms offenses).

Ultimately, Defendant's criminal record demonstrates his repeated disrespect for the law and a substantial possibility (though admittedly, and fortunately, not a certainty) of recidivism. Accordingly, the Court concludes that these things weigh against granting compassionate release.

Moreover, it is relevant to this particular factor (and presumably the next factor below) that, as the Government notes, Defendant's condition has been managed while in prison and BOP has been taking efforts (imperfect though they may be) to control the spread of COVID-19. *See Ruffin*, 978 F.3d at 1009 (affirming district court's denial of motion for compassionate release for

an inmate-defendant with serious medical conditions, in part because he "was receiving regular medical treatment to manage those conditions" and "the prison had adopted sufficient preventive measures to slow the spread" of COVID-19"). Thus, the Court agrees with the Government that there is no reason to believe Defendant would receive better care than he is currently receiving if he were released.

*The need to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor of compassionate release for Defendant. The Court will first focus on Defendant's medical need to avoid a COVID-19 infection and, failing that, to avoid a poor outcome from a COVID-19 infection.

The Court will not act like it knows the extent to which Defendant's chances of COVID-19 infection would be lower if he is released than if he stays in BOP custody, or how much more likely a bad outcome upon infection would be for him as opposed to someone without his medical condition. As matter of sheer epistemology, the undersigned cannot and does not know such things; this is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as some seem to have reversed themselves on various issues over time.[8] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been in constant flux, and it would be folly for the Court to rely blindly on any

---

[8] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; the extent to which COVID-19 may be transmitted via contact with inanimate surfaces; and whether an effective vaccine could be rolled out during calendar year 2020.

particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is willing to accept that Defendant is at substantial risk of COVID-19 infection at FCI Gilmer, as there are currently 70 active COVID-19 cases in the facility. *See COVID-19*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last accessed Jan. 4, 2021). The Court is also willing to assume that Defendant's medical conditions make him prone to relatively bad outcomes in case of infection.

But that does not mean that these circumstances ultimately support compassionate release. For one thing, the Court would merely be speculating as to the extent of the risk of infection at FCI Gilmer and as to the likelihood of a bad outcome upon infection. For another thing, to say the least, it is not like there in no substantial risk of infection outside of BOP custody; COVID-19 cases continue to rise across the United States, including Ohio (where Defendant proposes to reside) that has over 727,000 confirmed or probable cases of COVID-19. *See* Ohio Dept. of Health, COVID-19 Dashboard, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/overview (last accessed Jan. 4, 2021). And as is also a matter of public record, these cases have accrued despite substantial steps by both individuals and government authorities to keep the infection rate down.

Additionally, given Defendant's history of criminal activity, Defendant unfortunately has demonstrated an unwillingness and/or inability to comply with rules and societal norms in at least some important respects. This is vital because decreasing his risk of infection upon release from BOP custody would require him to observe public/health and societal norms related to COVID-19, such as handwashing, face-covering and social distancing. For all of these reasons, there is no

good basis to believe that Defendant's release is likely *in actuality*—not just theory—to substantially reduce his risk from COVID-19.

*The sentencing guidelines and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* do not support compassionate release. The guideline range for Defendant was life, plus five years, consecutive to all other counts. (PSR at 30). The Court sentenced Defendant to serve 420 months of imprisonment, a below-guidelines (albeit severe) sentence.[9] The revised sentence requested by Defendant amounts to less than 20% of his original sentence. This sentence would represent a huge variance from what is already a below guideline sentence, and this fact may weigh against his release. *See United States v. Kincaid*, 805 F. App'x 394, 395-96 (6th Cir. 2020) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions); *Ruffin*, 978 F.3d at 1008 (affirming district court's denial of motion for compassionate release, in part because the defendant-inmate "has yet to serve even half of his 25-year sentence" and because "the court had already varied downward" by one-sixth the bottom of the guideline range). Although the guidelines of course are advisory only, and there is nothing wrong with below-guidelines sentences in general, the Court can (and in this instance does) treat such a large requested variance as tending to frustrate the objective of avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

Accordingly, the Court finds that to grant Defendant compassionate release would create an unwarranted sentence disparity among defendants with similar records who have been found

---

[9] Notably, given Defendant's age, the Court cannot say that the 420-month sentence is a effectively a life sentence. Defendant would be 71 at the time of his projected release date, and thus retains the possibility of a meaningful lifespan after his release.

guilty of similar conduct. The Court also notes that the fact that Defendant has served nowhere near all of his sentence can weigh against Defendant not only on this factor, but also on other factors. *See Ruffin*, 978 F.3d at 1008 ("We have recognized that some of the § 3553(a) factors, including the "need to provide just punishment" and "to reflect the seriousness of the offense," allow courts to consider the "amount of time" that a defendant has served on a sentence when deciding whether to grant a sentence reduction."); *see also Jones*, 980 F.3d at 1115 (affirming the district court's denial of the defendant's compassionate release motion where the district court examined the Section 3553(a) factors and reasoned that the factors weighed against granting the motion because, among other things, the defendant "had served only two years of his decade-long sentence [for non-violent drug offenses] and that [the defendant] was a repeat offender").

Additionally, the Court cannot say that requested reduction of the Court's original sentence would fully reflect the seriousness of the offense Defendant committed, provide a just punishment for his conduct, and promote respect for the law. For those reasons, the Court finds that the Section 3553(a) factors also weigh in favor of denying Defendant's Motion.

## CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable here, given that it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, the Motion (Doc. No. 507) is **DENIED**.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE